# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
THIRD DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> **Plaintiff,** <br><br> v. <br><br> **MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES;** and **TIKKI BROWN,** in her official capacity as Commissioner of the Minnesota Department of Children, Youth, and Families, <br><br> **Defendants.** | **Case No.** <br><br> **DECLARATION OF SHIELA CORLEY** |

Pursuant to 28 U.S.C. § 1746, I Shiela Corley, declare:

1. I am the former Chief of Staff to the Deputy Under Secretary for the Food, Nutrition, and Consumer Services ("FNCS") mission area, which was a component of the United States Department of Agriculture ("USDA"). I served in that position from February 2025 to June 2026. I worked for FNCS since 2018, and I have worked for USDA in various capacities since 1995.

2. Since June 2026, I have served as the Acting Administrator for the Food and Nutrition Administration ("FN Administration")—the entity created by the consolidation and reorganization of the Food, Nutrition, and Consumer Services (FNCS) with the Food and Nutrition Service (FNS).

3.      In my capacity as Chief of Staff and Acting Administrator, I provide guidance and support to USDA senior leadership on matters pertaining to the administration of sixteen domestic nutrition and food security programs and the promotion of dietary guidelines. I also supervise Gina Brand, the Senior Policy Advisor for Integrity.

4.      I make the statements herein based on personal knowledge as well as on information I acquired while performing my official duties, including a review of agency files and discussions with colleagues at FN Administration who are familiar with the facts at issue in this litigation. If called upon as a witness, I could and would competently testify thereto. Throughout this declaration, I use "State Agency" as I have defined that term in Paragraph 28, and "Non-Compliant States" as I have defined that term in Paragraph 40.

## I.   Exhibits

### A.   Previous Correspondence Between USDA and Non-Compliant States

5.      Attached hereto as **Exhibit 1** is a true and correct copy of a letter dated May 6, 2025, which USDA employee Gina Brand sent to each State Agency except for those for Guam and the U.S. Virgin Islands.

6.      Attached hereto as **Exhibit 2** is a true and correct copy of a letter dated July 9, 2025, which United States Secretary of Agriculture Brooke L. Rollins sent to each State Agency except for those for Guam and the U.S. Virgin Islands.

7.      Attached hereto as **Exhibit 3** is a true and correct copy of a letter dated July 23, 2025, which USDA employee Gina Brand sent to each State Agency except for those for Guam and the U.S. Virgin Islands.

8.      Attached hereto as **Exhibit 4** is a true and correct copy of a letter dated July 25, 2025, which USDA Deputy Under Secretary Patrick A. Penn sent to each State Agency except for those for Guam and the U.S. Virgin Islands.

9.      Attached hereto as **Exhibit 5** is a true and correct copy of a letter dated August 12, 2025, which USDA Deputy Under Secretary Patrick A. Penn sent to Non-Compliant States except the District of Columbia, to which Deputy Under Secretary Penn sent the letter on August 20, 2025.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of a letter dated August 20, 2025, which USDA Deputy Under Secretary Patrick A. Penn sent to Non-Compliant States except the District of Columbia, to which Deputy Under Secretary Penn sent the letter on August 26, 2025.

11.     Attached hereto as **Exhibit 7** is a true and correct copy of a letter dated November 24, 2025, which USDA Deputy Under Secretary Patrick A. Penn sent to Non-Compliant States.

12.     Attached hereto as **Exhibit 8** is a true and correct copy of a letter dated December 8, 2025, which Non-Compliant States sent to counsel for USDA.

13.     Attached hereto as **Exhibit 9** is a true and correct copy of a letter dated December 23, 2025, which USDA Deputy Under Secretary Patrick A. Penn sent to Non-Compliant States.

14.     Attached hereto as **Exhibit 10** is a true and correct copy of a letter dated February 17, 2026, which USDA sent to Non-Compliant States.

15.     Attached hereto as **Exhibit 11** is a true and correct copy of a letter dated February 25, 2026, which Non-Compliant States sent to counsel for USDA.

16.     Attached hereto as **Exhibit 12** is a true and correct copy of a letter dated March 10, 2026, which USDA sent to Non-Compliant States.

17.     Attached hereto as **Exhibit 13** is a true and correct copy of an email correspondence between Non-Compliant States and counsel for USDA, dated March 10, 2026 to March 11, 2026.

18.     Attached hereto as **Exhibit 14** is a true and correct copy of a letter dated March 25, 2026, which Non-Compliant States sent to counsel for USDA.

19.     Attached hereto as **Exhibit 15** is a true and correct copy of a letter dated March 27, 2026, which USDA sent to Non-Compliant States.

20.     Attached hereto as **Exhibit 16** is a true and correct copy of a letter dated March 30, 2026, which Non-Compliant States sent to counsel for USDA.

**B.     Correspondence Between USDA and Defendants**

21.     Attached hereto as **Exhibit 17** is a true and correct copy of a letter dated May 15, 2026, which USDA addressed to Defendants, who acknowledged receipt.

22.     Attached hereto as **Exhibit 18** is a true and correct copy of a letter with attached data and security protocols and data elements dated May 22, 2026, which Non-Compliant States, rather than Defendants, sent to counsel for USDA.

23.     As of the date of this filing, Defendants have not independently responded to USDA's letter dated May 15, 2026, or its demand for records and proposed data and security protocols, other than to acknowledge receipt.

4

24.     The U.S. Secretary of Agriculture made a formal request to the Attorney General of the United States pursuant to 7 U.S.C. § 2020(g) to bring an action for injunctive relief to compel Defendants to comply with the Food and Nutrition Act of 2008 ("FNA") and its regulations, including USDA's request for records under 7 U.S.C. § 2020(a)(3).

## II.    Administration of the Supplemental Nutrition Assistance Program ("SNAP")

25.     FNS was an agency within the FNCS mission area. FNS and FNCS were consolidated and reorganized into the FN Administration in June 2026 as part of a larger Departmental reorganization within USDA.

26.     The FN Administration, and previously FNS, administers nutrition assistance programs for USDA, including the Supplemental Nutrition Assistance Program ("SNAP"). 7 C.F.R. § 271.3. The mission of FN Administration, like FNS, is to provide children and needy families with better access to food and a more healthful diet through its food assistance programs. SNAP is the successor to the Food Stamp Program and is the nation's largest domestic food assistance program, serving over 37 million people in an average month.

27.     The mission of SNAP is to "safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011. Assistance is focused on increasing the food purchasing power of eligible households by supplementing the funds those households have to spend on food with SNAP benefits. 7 U.S.C. § 2013. SNAP benefits are fully funded with Federal dollars, and USDA pays 50 percent of a State Agency's administrative costs. 7 U.S.C. §§ 2025, 2027. In fiscal year 2024, in approximate figures, USDA funded $92.9 billion in benefits and

$5.3 billion in State Agency administrative costs. In fiscal year 2025, in approximate figures, USDA funded $95.7 billion in benefits and $5.4 in State Agency administrative costs.

28.     SNAP's administration is accomplished through partnerships with State Agencies. "State Agency" refers to the agency of State government, including its local offices, which has "the responsibility for the administration of the federally aided public assistance programs within such State." 7 U.S.C. § 2012(s)(1). The term State Agency includes the SNAP agencies for all fifty states, the District of Columbia, and the territories of Guam and the U.S. Virgin Islands. *Id.* § 2012(r), (s). For SNAP, the State Agencies conduct eligibility determinations for applicant households and calculate benefit amounts for eligible households.

29.     A household that meets SNAP eligibility requirements, which are predominantly income and asset-focused, is provided an Electronic Benefit Transfer (EBT) card they can then use to access their SNAP benefits. The SNAP benefits, which are 100% federally funded, are loaded onto the EBT card monthly and may be used similar to a debit card only to purchase eligible food at SNAP-authorized retailers.

30.     State Agencies, using federal funding to administer SNAP, contract with private companies, known as EBT Processors, to facilitate the issuance of SNAP benefits to households. Based on household and benefit information transmitted from SNAP State Agencies, EBT Processors provide the infrastructure to issue electronic benefits to SNAP households through the EBT system. Because of this role, EBT Processors hold personal identifying information as well as the EBT card number and transactional data obtained

6

from SNAP recipients. Multiple States have contract provisions with the EBT Processors providing that applicant data cannot be disclosed absent State consent.

31.     At the federal level, FN Administration is responsible, in part, for administering SNAP for retail food stores and issuing administrative rules. *See* 7 U.S.C. § 2013(a), (c); 7 CFR § 271.3. Additionally, FN Administration is charged with overseeing State Agencies' administration of SNAP, including reviewing their submitted Plans of Operations and their payment accuracy. 7 U.S.C. § 2020(d). This was also true of FNS.

## III.     USDA's Data Gathering Initiative

### A.     May 6th Letter

32.     On May 6, 2025, USDA addressed a letter ("May 6, Letter") to all SNAP State Agency Directors except those for the territories of Guam and the U.S. Virgin Islands, informing them that pursuant to its authority under the FNA, USDA will be collecting data from their EBT Processors to ensure program integrity, including verifying the accuracy of eligibility determinations. This letter was signed by Senior Policy Advisor for Integrity Gina Brand. The Letter provided two authorities under the FNA its and implementing regulations that provide for sharing of SNAP applicant data with the FN Administration, including 7 U.S.C. § 2020(a)(3)(B)(i) and 7 U.S.C. § 2020(e)(8)(A).

33.     The May 6 Letter explained the purpose of the data-gathering initiative to State Agencies, clarifying that any consent to disclosure required under their contracts with EBT Processors complied with 7 U.S.C. §§ 2020(a)(3)(B)(i) and 2020(e)(8)(A) and did not violate statutory obligations to safeguard SNAP applicant data. The May 6 Letter also

7

informed State Agencies that failure to take the steps necessary to provide SNAP data to FNS may trigger noncompliance procedures codified at 7 U.S.C. § 2020(g).

34.    Although USDA sent and published the May 6 letter, USDA instructed EBT Processors to refrain from sending any data until USDA completed procedural steps to ensure that data received would be appropriately safeguarded and to satisfy legal requirements.

### B.    Publication of the SORN

35.    On June 23, 2025, USDA published a notice of a new system of records (SORN) in the Federal Register in compliance with the Privacy Act. 90 Fed. Reg. 26521. This notice established the "USDA/FNS-15, "National Supplemental Nutrition Assistance Program (SNAP) Information Database." *Id.* This SORN became effective upon publication in the Federal Register, except for the routine uses, which were open to public comment through July 23, 2025. *Id.*

36.    The SORN provides detailed information on the records the system would contain, how those records would be used, where they would be located, and with whom they would be shared. *Id.* It also provides the list of legal authorities for the system, including 7 U.S.C. § 2020(e)(8). *Id.* at 26521-22.

37.    The SORN also explains the purpose of the system—ensuring the integrity of SNAP—and provided that the data it contained would be used "to identify and rectify any ineligible, duplicate, or fraudulent SNAP enrollments or transactions," including "verifying eligibility based on immigration status, identifying and eliminating duplicate enrollments, assisting States in mitigating identity theft, and performing other eligibility

8

and program integrity checks." *Id*. at 26522. Because many Government programs confer automatic or reciprocal eligibility based on SNAP participation, these activities also ensure the integrity of Government programs writ large.

38.     On June 15, 2026, USDA published a revised SORN in the Federal Register giving notice of several changes to the rules governing the SNAP Information Database. 91 FR 35948–49 (June 15, 2026). Among other things, the amended SORN stated "more clearly that all routine uses are subject to applicable legal requirements including the Privacy Act and the Food and Nutrition Act." *Id.* at 35949. The revised SORN modified several of the routine uses to reflect that the SNAP Information Database was subject to the FNA's use and redisclosure restrictions on information obtained from household applicants under § 2020(e)(8) and removed the routine use that previously stated "foreign" agencies could potentially receive records from the Database. *Id.* at 35949–51. The revised SORN also clarified "that records in the National SNAP Information Database are maintained electronically and hosted in a FedRAMP High certified cloud infrastructure environment." *Id.*

### C.     Privacy Impact Assessment

39.     USDA also prepared a Privacy Impact Assessment (PIA) in compliance with the E-Government Act of 2002. The PIA reflects USDA's full consideration of privacy matters related to the data gathering initiatives and that privacy protections would be incorporated into the system throughout the life cycle of information contained therein.

## IV.     Evidence of Potential Waste, Fraud, and Abuse

### A.  State Agency Compliance and Evidence of Fraud, Waste, and Abuse

40.    As of June 25, 2026, the State Agencies responsible for SNAP administration in twenty-nine States ultimately complied with USDA's demand ("Compliant State Agencies") and produced five years of their SNAP records pertaining to household eligibility, allotments, and EBT transactions. Twenty-two State Agencies responsible for SNAP administration, including Defendants, ultimately did not comply with USDA's demand. Each of those non-compliant State Agencies filed suit in the United States District Court for the Northern District of California through either their State attorneys general or governors ("Non-Compliant States"). *See* Amended Compl. for Decl. and Inj. Relief, *California v. U.S. Dep't of Agric.*, 3:25-cv-06310-MMC, (N. D. Cal. Sept. 22, 2025), ECF No. 84. To date, USDA has not received the records it demanded from Non-Compliant States, including records of the administration of SNAP in Minnesota, which is performed by Defendants.

41.    Despite being a party to the lawsuit, the State Agency for Nevada provided its records to USDA. The State Agency for Kansas initially refused to provide its records but did not join Non-Compliant States' lawsuit; however, between March and April 2026, the State Agency for Kansas entered into an agreement with USDA and provided its records.

42.    USDA cannot complete its analysis and eliminate systemic problems until it has the records it required all State Agencies to produce. For example, a potentially large percentage of waste, fraud, and abuse occurs when SNAP recipients collect benefits from multiple State Agencies. Without Defendants' records, USDA cannot determine whether

10

recipients in surrounding states are collecting payments from the State Agencies in their states and through Defendants in Minnesota, or vice versa.

43. Despite these limitations, USDA concluded there could be substantial waste, fraud, and abuse in SNAP based on its ongoing and preliminary data analysis of Compliant State Agencies' records. To reach this conclusion, USDA determined that the Compliant State Agencies had certified over 1 million apparently ineligible recipients to receive SNAP benefits during the month of July 2025. USDA determined these recipients were ineligible based on obvious red flags — including dead recipients, recipients who were certified to receive multiple allotments within or among states, recipients with dummy social security numbers (i.e., 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 or 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), and previously disqualified recipients. USDA determined each flagged recipient's average per month benefit amount to be $188, or $2,256 annually per recipient. This amount was chosen, as it represented the average benefit amount per person in fiscal year 2025. USDA then calculated "annual implied dollar" amounts for each ineligibility category by assuming State Agencies would continue to certify and pay each of these recipients SNAP benefits over the next twelve months—the most common certification period length. USDA thereby concluded that the compliant State Agencies could pay up to $3 billion in SNAP overpayments over course of the year.

44. A true and correct copy of USDA's preliminary data report is located at available at https://perma.cc/ZL8D-HYHD. U.S. Depart. Agric., *USDA SNAP Program Integrity Data Team: Preliminary Report* (May 13, 2026).

11

45. Because State Agencies follow different practices in how and when they review household members and recipients for new instances of ineligibility criteria, some of the compliant State Agencies would likely identify and eventually disqualify some of these apparently ineligible recipients or would otherwise stop or reduce their allotments. Nevertheless, USDA's establishment of the SNAP Information Database as a central repository of the records will allow USDA to identify these potentially ineligible recipients and stop overpayments with greater precision, regularity, and efficiency than State Agencies.

**B.    Trends in State Agency Overpayment Rates**

46. As part of the FNA's quality control system, USDA must periodically review statistical samples of household records from State Agencies to determine each state's annual payment error rate. 7 U.S.C. § 2025(c)(1)(B). Payment error rates are the sum of a State Agency's overpayment and underpayment error rates. 7 U.S.C. § 2025(c)(2). Whereas overpayment error rates reflect payments made by State Agencies that exceed the allotments to which households are lawfully entitled, underpayment error rates reflect payments made below the allotments to which households are lawfully entitled. 7 U.S.C. § 2025(c)(2). Overpayment error rates represent waste and abuse. 7 U.S.C. § 2025(c)(2). Under the FNA, State Agencies that have payment error rates that consistently exceed certain annual thresholds may be assigned a liability amount or subject to remedial measures. 7 U.S.C. § 2025(c)(1)(C), (c)(1)(G).

47. The quality control system provides the framework through which USDA evaluates the accuracy of State Agencies' eligibility determinations and benefit

calculations. The system is designed not to identify every ineligible household but to measure systemic accuracy based on statistical samples, supply information for corrective action, and establish State liability when payment errors consistently exceed national performance standards.

48.     Because the quality control system relies on sample reviews, persistently high or rising error rates are strong indicators of widespread issues within a State's administration of SNAP. Against this backdrop, the dramatic growth in national overpayment error rates over the last decade demonstrates that many States are not accurately determining eligibility or benefit levels, are not adequately verifying household information, and are not taking appropriate corrective action to address the root causes(s) of known deficiencies.

49.     For example, the national average overpayment error rate for fiscal year 2017 was 5.19 percent of national allotments; in 2025, it was 9.28 percent, which represents over $8.8 billion in waste and abuse nationwide in that year alone. The national average overpayment error rate has also surged in the years since the COVID-19 pandemic. In the three fiscal years preceding the pandemic, the national overpayment error rates were 5.19 (FY 2017), 5.59 (FY 2018), and 6.18 (FY 2019) percent of national allotments; and in the four fiscal years for which there are published data following the pandemic, the overpayment error rates were 9.84 (FY 2022), 10.03 (FY 2023), 9.26 (FY 2024), and 9.28 (FY 2025) percent of national allotments. This surge was due in part to Congress's passage of temporary laws that allowed State Agencies to extend eligibility certification periods and suspend in-person interviews of program applicants. *E.g., Continuing Appropriations*

13

*Act, 2021 and Other Extensions Act*, Pub. L. No. 116-159, § 4603(a)(2), 134 Stat. 709, 746 (2020). The actual overpayment error rates during 2020 and 2021 could be much higher but are unknown—State Agencies did not provide, and were not required to provide, USDA with sufficient information through the quality control system to establish rates during that period. USDA has now sought complete records from this period for its SNAP Information Database to analyze them for the first time.

50.     State Agencies often make improper payments because they fail to verify household eligibility based on citizenship, education, employment, finances, household size, identity, and residence. When collecting and analyzing data to establish overpayments, each State Agency's practice varies depending on program structure, staff expertise, and state agency priorities. Some State Agencies have limited resources to perform thorough analysis of root causes, and some State Agencies do not employ statisticians.

51.     Overpayment error rates based on a sample of State Agency cases can lead to the establishment of liability amounts as part of the SNAP quality control system. However, this system has limits aligned with its purpose—as a system based on statistical samples of household case records, it is incapable of identifying for review and removal all apparently ineligible households. Instead, the system is designed to give State Agencies evidence of systemic improper payments and prompt them to take the next step of eliminating root causes to avoid potential liabilities in subsequent years. The year-after-year surge of the national average overpayment rate indicates that states—while holding

14

all the records—are failing to take enforcement action, and thus, failing to comply with the law.

### C.    Major System Failures and Instances of State Agency Fraud and Abuse

52.    USDA has also detected numerous instances of major systemic failures in the administration of SNAP by certain State Agencies, including recently Rhode Island and the District of Columbia. For example, in May 2024, USDA established a claim against Rhode Island for certain overpayments that occurred within the state from September 2016 through December 2019 as the result of a major systemic failure caused by problems with its eligibility system. USDA's claim against Rhode Island for overpayments was an amount exceeding $37 million. Despite being notified by the USDA that it would be liable for this failure in August 2017, Rhode Island failed to address the failure for another two years.

53.    Similarly, in October 2017, USDA notified the District of Columbia that it would be liable for overpayments that began occurring within the District in October 2016 that were the result of a major systemic failure. Despite this notice, the District of Columbia's major systemic failures continued to produce overpayments through December 2019. In May 2024, USDA informed the District that it would now be liable for over $30 million in overpayments as a result of the error.

54.    As these cases demonstrate, major systemic failures result in overpayments that can involve significant sums of money and go undetected for years. This can exacerbate the consequences for a State Agency because the Secretary may prohibit it from collecting these overpayments from some or all of the impacted households. Even when

15

they are detected, the appeals process and uncertainty over calculation accuracy can take years to resolve. Although USDA informed State Agencies for the District of Columbia and Rhode Island that they would be liable for these overpayments because of their major systemic failures, their appeals are still active almost a decade after the failures first occurred. With access to the records that USDA required State Agencies to produce, USDA would be able to review every eligibility and benefit level determination for accuracy and thus detect major systemic failures occurring within a state earlier, helping to mitigate the total dollar value of overpayments and therefore the total dollar value of claims established against the State Agencies. These records would also permit USDA to accurately calculate overpayment amounts instead of relying on estimations.

55.     State Agencies have engaged in intentional fraud and abuse of SNAP. For example, in January 2026, a former California State Agency eligibility worker pleaded guilty to aggravated identity theft for stealing identities of household members and fraudulently obtaining SNAP benefits in their names. For a nearly three-year period, the employee improperly used county databases to which she had access through her job to obtain identifying information for individuals who either were not United States citizens, were elderly, or were deceased. She then secretly approved these individuals to receive or continue receiving SNAP benefits, printed EBT cards in their names with the benefits deposited thereon and spent the money on herself and her family members.

56.     In other cases, USDA has identified State Agency employees engaged in apparent program abuse and disregard for their statutory duties. For example, in a video-recorded training for its SNAP eligibility workers, the Program Manager for Minnesota's

State Agency admitted that "fraud has never been a big focus for me" while also acknowledging that fraud "[e]xists in government from top to bottom." The training instructed State officials responsible for SNAP eligibility determinations and fraud referrals to consider "why" someone has violated SNAP. Minnesota urged its SNAP eligibility workers to find ways to avoid adverse outcomes, disparaging as "punishment" income limits on eligibility for receiving public assistance. Without USDA's access to State Agency records, these instances of fraud and abuse can go undetected and unabated for longer periods of time.

### D.    Defendants' Payment Error and Overpayment Rates

57.    Some of Minnesota's government agencies, in particular, have failed to safeguard American taxpayer dollars that fund Minnesota's public benefit programs. In September 2022, the U.S. Department of Justice announced criminal charges against 47 defendants for their alleged roles in a $250 million fraud scheme in Minnesota that exploited a USDA-funded child nutrition program. In September 2025, the U.S Department of Justice announced that it had charged the 75th defendant in this scheme. Throughout this entire scheme, federal funds provided to Minnesota by USDA that were intended as reimbursements for the cost of serving meals to children were instead misappropriated and laundered.

58.    As to SNAP, USDA has identified some of Defendants' employees who have engaged in discussions about apparent program abuse and disregard for their statutory duties. In 2023, one of Defendants' SNAP program managers gave Defendants' SNAP

17

eligibility employees a video-recorded training[1] in which she stated, "fraud has never been a big focus for me" while acknowledging that fraud "[e]xists in government from top to bottom." Defendants' program manager instructed Defendants' employees responsible for SNAP eligibility determinations and fraud referrals to consider "why" someone has violated SNAP. Defendants urged its SNAP eligibility workers to dig for ways to avoid adverse outcomes, disparaging as "punishment" income limits on eligibility for receiving public assistance. Without USDA's access to State Agency records, these instances of fraud and abuse can go undetected and unabated for longer periods of time.

59.     In December 2025, a local Minnesota news agency reported that the Defendants "repeatedly reported incorrect information about [SNAP] to the federal government."[2] According to the report, Defendants relied on the flawed data to respond to the news agency's questions about SNAP. According to Defendant Tikki Brown, her agency "just learned about that fairly recently, when folks started reaching out to us." In an interview with the news agency, Defendant Brown answered questions about the prevalence of SNAP fraud in Minnesota. She responded that less than 1% of SNAP recipients are found to have committed fraud, with only 143 intentional program violations committed. However, according to the report, Defendants later confirmed those numbers

---

[1] Minnesota Department of Human Services training video entitled, "Fraud Prevention and Investigations: The Impact On Children Living In Poverty" (last visited Jan. 8, 2026), https://perma.cc/XE3D-PN4S

[2] Kristen Swanson, Minnesota Repeatedly Reported Inaccurate data on SNAP to the Federal Government, KTSP.COM (Dec. 15, 2025), https://perma.cc/T2PT-5BF3

were incorrect and some of the SNAP issuance data and fraud numbers they submitted to USDA were incorrect.

60.   Defendants' administration of SNAP in Minnesota has followed the national trend and produced excessive overpayments in recent years. Defendants' payment error rate has exceeded the standard tolerance level of 6 percent in each of the six most recent fiscal years for which there is reported data (i.e., fiscal years 2018–19 and 2022–25). Thus, Defendants have been statutorily required to participate in corrective action plans under the supervision of USDA.

61.   Defendants' SNAP overpayment error rate amounted to 6.32 percent in fiscal year 2024 and 9.86 percent in fiscal year 2025. As Defendants paid out over $856.3 million in federally funded SNAP benefits in 2024, their overpayment error rate produced over $54 million in improper payments in that year alone — all due to waste and abuse. These excessive overpayments are evidence that Defendants failed to enforce SNAP at the State Agency level by failing to identify and eliminate root causes of errors, a problem that USDA will correct through its SNAP Information Database.

Under penalty of perjury, pursuant to 28 U.S.C. § 1746(2), I declare the foregoing to be true and correct to the best of my knowledge.

On this 26th day of June 2026, in Washington, D.C.

SHIELA CORLEY

Digitally signed by SHIELA CORLEY
Date: 2026.06.26 16:21:30 -04'00'

Shiela Corley

19