# EXHIBIT 8

Ex. 8-001

*Via E-mail*
Elizabeth J. Shapiro
Benjamin S. Kurland
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 598-7755
ben.kurland@usdoj.gov
*Counsel for U.S. Department of Agriculture and Secretary of Agriculture Brooke L. Rollins*

RE: Response to November 24, 2025 Letter to Plaintiff States from Patrick A. Penn

Dear Counsel:

On behalf of the Plaintiff States in *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025), this letter responds to the November 24, 2025, letter of the U.S. Department of Agriculture's (USDA) Food and Nutrition Services (FNS). *See* ECF No. 109.

In that letter, USDA restated FNS's ongoing demand for Supplemental Nutrition Assistance Program (SNAP) Eligibility Data Elements for the period of January 1, 2020, to the present. As you are aware, this demand is the subject of ongoing litigation and was previously enjoined by the Court. *See* Order Granting Plaintiff States' Motion for Preliminary Injunction, *California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Oct. 15, 2025). Thus, any attempt to seek a financial penalty or initiate an administrative noncompliance proceeding based on USDA's new letter, or any other iteration of FNS's ongoing data demand, would, at minimum, constitute a violation of that order, which preliminarily enjoins USDA from "disallowing SNAP funding based on Plaintiff States' failure to comply with the demands" for this SNAP data.

USDA's letter also provided proposed "data and security protocols," which by statute must be "agreed to by the State agency and Secretary" under 7 U.S.C. § 2020(a)(3)(B)(i). USDA's letter concluded by asking State agencies to produce the demanded SNAP data within 30 days, or to respond in writing to explain "(1) the basis for your lack of agreement and (2) any proposed edits to the protocols that you deem necessary to produce the requested data." This letter seeks clarification and to provide both (1) and (2), though we intend to provide further, more detailed edits to the proposed agreement after receiving the necessary clarifications sought herein, which will inform and facilitate those additional edits.

For the reasons described in our Complaint and Preliminary Injunction Motion, we object to USDA's unprecedented collection of millions of Americans' sensitive personally identifiable information (PII) without a clear need for such data and in violation of federal privacy laws. Nevertheless, we agree that USDA must negotiate with the States to develop a mutually agreeable data and security protocol prior to any data collection that may be authorized by 7 U.S.C. § 2020(a)(3). Therefore, without waiving any claims or defenses that may be raised in the

1

Ex. 8-002

pending litigation, we are responding to provide comments on the proposed Data Elements and Data Sharing Protocol attached as Attachments A and B to the letter. Additional questions concerning both are also attached to this response.

We request written responses to the questions in this letter and the Attachment by Monday December 15, 2025.

### I.    The proposed data security protocol is insufficient compared to prior agreements between USDA and State agencies.

As an initial matter, FNS's letter claims that each of the States "previously delivered the same type of data to FNS under *less stringent* protocols." This assertion is inaccurate for several reasons. First, FNS has never sought anything comparable to the nearly six years of unredacted PII on all SNAP applicants and beneficiaries that it has now demanded; this unprecedented demand creates novel risks concerning the misuse of data and the protection of individuals' privacy.

Furthermore, without any reference to any specific protocol executed with any one of the States that received this letter, it is impossible to know whether prior protocols used to share a less sensitive data set were "less stringent" as you assert. Therefore, we ask that USDA specifically identify or provide copies of the protocols you refer to—for each State—so that we may evaluate this claim.

USDA's statement that this is a higher level of security and more stringent than previous protocols also appears to ignore the framework for the National Accuracy Clearinghouse (NAC) database that Congress mandated to identify duplicate SNAP enrollment. For example, the SORN for the NAC database mandates that any PII (including names, social security numbers (SSNs) and dates of birth (DOBs)) are converted to a secure cryptographic hash via the Privacy Protecting Record Linkage (PPRL) process before being shared. While some States are still working towards implementing the NAC, we would expect to see, at a minimum, the same protections (and the same careful testing and rollout process) applied to USDA's more recent request for SNAP Eligibility Data Elements.

The proposed protocol document also remains merely "a framework" that lacks many details required by federal law. *See* Proposed Protocol § 1.2. For example, when the federal government creates a "matching program," which the SNAP Information Database plainly is, agencies' data sharing agreements must articulate detailed procedures to protect the privacy, security and accuracy of individuals' data records. *See* 5 U.S.C. § 552a(o)(1). Attachment B falls far short of these specificity requirements. USDA has entered into necessarily detailed computer matching agreements and Interconnection Security Agreements (ISAs) with state agencies to implement the NAC and Electronic Disqualified Recipient System (eDRS) systems. Similarly detailed and comprehensive agreements are needed to implement any agreed-upon protocol before state agencies can lawfully share information.

Ex. 8-003

Furthermore, although USDA's proposed protocol prohibits certain data uses, it does not define enforcement mechanisms. Without such mechanisms, the proposed protocol offers state agencies no assurance that violations will be detected, prevented, or corrected. Without enforcement mechanisms (such as monitoring, auditing, automated controls, or documented consequences), the restrictions function only as statements of intent. This creates compliance risk, allows improper data use to go unnoticed, and weakens the ability of State agencies to ensure legal, ethical, and policy-aligned handling of SNAP information.

The proposed protocol also presents, for the first time, a process by which USDA will return "flagged" results back to the State for State agency action. *See* Proposed Protocol § 7.1.1. In addition to the need for a secure data transfer mechanism and process to receive and process these files, the protocol fails to specify against which data the supposed fraud detection was identified, what specific actions the state must take to verify whether the fraudulent action is true, and what response the State must provide on its findings and subsequent actions. As discussed further below, applicable laws and policies require that all these iterative steps be spelled out in detail and agreed upon before any data sharing can take place.

## II. The proposed data elements and protocol, along with USDA's public statements, raise concerns about the accuracy and validity of USDA's planned data analyses.

State agencies agree with USDA that it should "minimize[] unnecessary data collection." *See* Proposed Protocol § 1.3. Furthermore, USDA asserts that it "shall collect only the data elements necessary to achieve specific, legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program integrity checks. The scope of data collection shall be limited by excluding sensitive PII unless directly relevant to these goals." *Id.* § 2.2.2.

What makes data necessary, however, cannot be assessed in the abstract. We therefore request that USDA share its methodologies and proposed data analysis techniques with States so that we can provide feedback on the data needed, and the validity of the analytical methods being used, before providing FNS with confidential information on millions of SNAP beneficiaries.

As we have expressed in the litigation, the queries run through the SNAP Information Database by USDA so far do not account for the actual processes States use to review and verify applicant and household information. Our review of the "preliminary snapshot review" (*see* ECF No. 89-1) that USDA created from data some States have already submitted reveals that USDA's apparent methodologies result in overwhelming numbers of false positives and would not provide an accurate or meaningful picture of States' case files.[1]  This is not only misleading to the public, but risks placing a heavy burden on States to investigate these false positives.

This information is especially important because the proposed protocol does not exclude sensitive PII at all, and USDA is requesting numerous data elements that do not appear necessary

---

[1] We have discussed the apparent problems with this snapshot review in declarations submitted by California (ECF No. 99-1) and Illinois (ECF No. 99-2).

Ex. 8-004

to investigate fraud, waste and abuse, especially at an aggregate level. It is necessary for the States to understand why USDA needs the specific PII elements requested so that the States can propose appropriate amendments to the draft protocol that would still accomplish any legitimate goals. Such amendments could include, for example, committing to using data solely for specific analyses described in the protocol and then purging it from USDA's system, as has been done in the past, and permitting States to provide information at a higher level of specificity depending on each agency's available data and technological capabilities (e.g., providing an age range rather than birthdate, or the county or ZIP code instead of a home address) to protect personal privacy.

Given the bulk review and processing USDA is engaging in (*see* ECF No. 72-1 at ¶ 34), it is unclear why deidentified data could not serve as a functionally identical and more secure means of identifying facts about program integrity to share with the States. Should USDA wish to review samples of cases identified through an initial deidentified process, States could participate under existing statutory procedures allowing for a full review of those individual eligibility cases. Another potential option could be through the use of a cryptographically secure PPRL approach, which, as noted, has already been developed for the NAC. Congress and the USDA explicitly created this privacy-protective system for this purpose, and States see no reason to circumvent it through the less-protective SNAP Information Database.

Additionally, the list of data elements attached to USDA's November 24, 2025 letter includes numerous elements (such as personal financial information) that were not considered in the agency's Privacy Impact Assessment.[2] This is a necessary step that the agency would need to correct before any data collection could proceed. Please confirm that USDA will be updating its Privacy Impact Assessment accordingly.

### III.    USDA is ignoring the existing process for testing new programs to identify fraud, waste and abuse.

The statutes defining SNAP (hereafter the "SNAP Act") enshrine a cooperative model between the federal government and the States. Indeed, experimental and pilot projects "designed to test program changes that might increase the efficiency of [SNAP] and improve delivery of [SNAP] benefits to eligible households" are codified in the law (7 U.S.C. § 2026), and the SNAP Act provides a mechanism for USDA to work with state agencies to design, implement and evaluate new initiatives. This collaboration also includes State-led projects supported by the federal government under the SNAP Fraud Framework Implementation Grant Program, authorized and funded by Congress to support State initiatives. USDA's own fact sheet about that program recognizes that "States have long served as incubators for testing strategies to help prevent program fraud." *See https://www.fns.usda.gov/snap/fraud-framework*. USDA's departure from

---

[2] *See* USDA Privacy Impact Assessment for Fiscal Year 2025 at 8-10 (July 23, 2025), available at https://www.usda.gov/sites/default/files/documents/fns-snap-information-database-pia.pdf.

Ex. 8-005

this collaborative model ignores congressionally authorized programs and States' own expertise in program integrity.

USDA's proposed data protocol appears to acknowledge the collaborative framework and relationship that the SNAP Act establishes, stating that "collaborative processes will be established" to ensure the accuracy of new data analysis techniques. *See* Proposed Protocol § 7.1.1. But USDA's approach seems to be inconsistent with this acknowledgement, considering USDA's unilateral demands for data and threats of punitive action.

The agency should provide a clear explanation of its proposed data analysis objectives and methodologies, and engage in the required collaborative processes (including but not limited to testing and validation of findings for accuracy) needed to ensure such analysis is accurate and useful for detecting fraud, waste and abuse, *before* demanding production of almost 6 years of nearly unlimited PII on SNAP users to create an unprecedented database unsupported by law.

We are ready and willing to engage with USDA on a process that defines valid analytical goals and the data needed to meet those goals. For example, if USDA wants to test out new data tools, it could use sample sets of deidentified data and engage in an iterative process to check accuracy and results, as it has done in the past. It is unreasonable for USDA to abandon these time-tested techniques, and to run opaque, untested data analytic tools on millions of records in a manner likely to result in inaccurate results—particularly when USDA has signaled a desire to use those inaccurate results to unfairly impugn the integrity of state SNAP programs or the eligibility of residents to receive necessary food assistance.

### IV.    The proposed data analysis is duplicative of work that is already done by state agencies to prevent waste fraud and abuse.

USDA's proposed data protocol acknowledges that its proposed program is "similar to the SNAP Quality Control program" that has already been implemented as required by Congress in 7 U.S.C. § 2025 and through USDA's promulgated regulations. *See* Proposed Protocol § 6.1.1. The new framework appears to disregard congressional intent concerning the conduct of a quality control program, particularly given that the requested data would not permit USDA to conduct appropriate verification of applicant files.

States already engage in the statutorily mandated Quality Control Program and Performance Reporting System (*see* 7 U.S.C. § 2025; 7 C.F.R. §§ 275.1–275.24), which specifies procedures for federal monitoring "to determine whether a State agency is operating SNAP and the Performance Reporting System in accordance with program requirements" including annual reviews, management evaluation, quality control reviews and validation of state agency error rates. *See* 7 C.F.R. § 275.3. For deceased and disqualified individuals, among other verifications conducted by State Agencies, Congress has determined that verification of compliance with these requirements is satisfied by States' submission of annual reports to the Secretary "containing sufficient information" for USDA to make a determination on States' compliance. 7 U.S.C.

Ex. 8-006

§ 2036c. Similarly, submission of state agency data for use in the NAC takes place under a specific statutory grant of authority. *See* 7 U.S.C. § 2020(x). States additionally conduct immigration verification through the Systematic Alien Verification for Entitlements Program (SAVE)[3] and verify income using federally approved income eligibility verification systems (*see* 7 U.S.C. § 2020(p)) which share data using privacy protective systems. States also already provide information on Intentional Program Violations (IPV) and program sanctions to USDA under existing reporting requirements and use the Electronic Disqualified Recipient system (eDRS) to check whether SNAP applicants have been disqualified from the program for fraud. For Electronic Benefit Transfers (EBT) fraud, FNS already receives daily transaction data for *all* EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious retailers for analysis and investigation.

USDA's proposed protocol specifies that USDA-FNS will collect "only the data elements necessary to achieve specific, legally permissible goals." Given the already-existing, rigorous and comprehensive quality control regime under the SNAP Act and USDA's implementing regulations, we request that USDA specifically identify any unique goals of the SNAP Information Database proposal that are not covered by existing programs and federal oversight, and which data elements are actually necessary to achieve those additional goals.

## V.    Clarifying questions and suggestions

In addition to the concerns highlighted above, we are attaching a list of questions and suggestions about USDA's proposed protocol, and how FNS intends to use and share the data that our residents have entrusted to our agencies. We request this clarifying information to understand USDA's proposal better, and in an effort to make progress towards a mutually agreeable data and security protocol. We invite collaboration to generate a program that will respect existing legal frameworks and SNAP household privacy, while making a positive impact on program administration.

States have always been primary partners and leaders in SNAP program integrity. We appreciate the increased detail provided in this protocol, and hope that with further discussion and refinement States can continue to assist USDA in achieving legitimate program integrity

---

[3] The SAVE Program itself is deployed in the SNAP context with privacy in mind; States' agreements with USCIS to use the SAVE program include "safeguards limiting release or rediscloure as required by State or Federal law or regulation as discussed in [7 C.F.R.] § 272.1(c) and as may be required by other guidelines published by the Secretary." 7 C.F.R. § 272.11(b). States must include the steps taken to comply with this limit on disclosure as part of their state SNAP plans. *Id.* § 272.11(e). State agencies are further restricted to using the SAVE Program only for limited purposes related directly to establishing eligibility and program integrity. *Id.* § 272.11(c).

Ex. 8-007

objectives while protecting the privacy of SNAP household data, reducing duplicative processes, and maintaining the security of confidential and sensitive information.

Dated: December 8, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
ANDREW Z. EDELSTEIN
ANNA RICH
EDWARD P. WOLFE
ROBIN GOLDFADEN
SEBASTIAN BRADY
WILLIAM BELLAMY

/s/ Maria Buxton
MARIA F. BUXTON
DEPUTY ATTORNEYS GENERAL
Attorneys for Plaintiff State of California

LETITIA JAMES
Attorney General of New York

KWAME RAOUL
Attorney General of Illinois

/s/ Mark Ladov
MARK LADOV
Special Counsel
JULIE DONA
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8240
mark.ladov@ag.ny.gov
Attorneys for Plaintiff State of New York

/s/ Sherief Gaber
HARPREET K. KHERA
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
115 S. LaSalle St., 35th Flr.
Chicago, Illinois 60603
(773) 590-7127
Harpreet.Khera@ilag.gov
Attorneys for Plaintiff State of Illinois

KRISTIN MAYES
Attorney General of Arizona

PHILIP J. WEISER
Attorney General of Colorado

/s/ Hayleigh S. Crawford
HAYLEIGH S. CRAWFORD (AZ NO. 032326)
LUCI D. DAVIS (AZ NO. 035347)
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov

/s/ David Moskowitz
DAVID MOSKOWITZ
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

7

Ex. 8-008

Luci.Davis@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Janelle R. Medeiros*
JANELLE R. MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL
Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

ANNE E. LOPEZ
Attorney General of Hawai'i

*/s/ Kaliko'onālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

OFFICE OF THE GOVERNOR *ex rel.* Andy
Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel

AARON M. FREY
Attorney General of Maine

*/s/ Brendan Kreckel*
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 0433-0006
Tel.:  207-626-8800

8

Ex. 8-009

LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Kentucky Governors'
Office*

Fax:  207-287-3145
brendan.kreckel@maine.gov
*Attorneys for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS
Chief State Trial Counsel
CASSANDRA THOMSON
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

DANA NESSEL
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

9

Ex. 8-010

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ *Kashif T. Chand*
KASHIF T. CHAND (NJ BAR NO. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of the State of New
Mexico

/s/ *Steven Prefrement*
STEVEN PERFREMENT
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

DAN RAYFIELD
Attorney General of Oregon

/s/ *Scott P. Kennedy*
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

JOSH SHAPIRO, in his official capacity as
Governor of the Commonwealth of
Pennsylvania

/s/ *Jacob B. Boyer*
JENNIFER SELBER
General Counsel
JACOB B. BOYER
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ *Madeline R. Becker*
MADELINE R. BECKER (RI BAR NO. 10034)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2151
mbecker@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

NICHOLAS W. BROWN
Attorney General of Washington

/s/ *Jennifer K. Chung*
JENNIFER K. CHUNG, WSBA #51583
WILLIAM MCGINTY, WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
jennifer.chung@atg.wa.gov
william.mcginty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

10

Ex. 8-011

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*
KARLA Z. KECKHAVER
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

11

**Ex. 8-012**

## Attachment 1:

## Questions and Suggestions Concerning USDA's Proposed Data and Security Protocol

*Limiting unnecessary data elements and scope*

1. Pursuant to USDA's acknowledgement that it must "minimize[] unnecessary data collection" (§ 1.3), and that it will collect "only the data elements necessary to achieve specific, legally permissible goals" (§ 2.2.2), please explain for each of the data elements in Attachment A:

    (a) how USDA intends to use this data element;

    (b) why it needs this data element for each SNAP beneficiary served by the State;

    (c) whether each data element is necessary to determine whether SNAP is being conducted in compliance with the SNAP Act, and why;

    (d) why such analysis is not duplicative of an analysis or match that already occurs;

    (e) whether each element is covered by the applicable System of Records Notice (SORN) and Privacy Impact Assessment (PIA); and

    (f) why it needs the data element for all files dating back to January 1, 2020.

*Clarifying and improving limitations on disclosure and use of data*

2. The proposed data sharing agreement states that the requested data will be used "to ensure the integrity of Government programs[.]" However, 7 U.S.C. § 2020(e)(8) permits States to disclose information obtained from applicant households only to persons directly connected with the administration of federal assistance programs for the administration or enforcement of that program. To ensure compliance with 7 U.S.C. § 2020(e)(8), will USDA limit its use of the data to "ensure the integrity of the SNAP program" only?

3. Section 2.2.1 of the proposed protocol says USDA shall not use the provided data for "law enforcement investigations beyond coordination regarding criminal and administrative SNAP violations." This phrasing does not appear in the SNAP Act and is unclear.

    (a) Please elaborate what USDA means by "coordination regarding criminal and administrative SNAP violations."

    (b) Can you confirm that USDA will not share any of this data with Immigration and Customs Enforcement (ICE) or any other Department of Homeland Security (DHS) subagencies for use in immigration enforcement activities?

    (c) In order to ensure that state SNAP data is not unlawfully used for immigration enforcement purposes, will USDA agree to include protocol language that alerts any State immediately if ICE or any other DHS subagency requests access to or use of

12

Ex. 8-013

this data and provides at least 30 days for that State to respond (and if necessary take legal action) to prevent such data sharing?

(d) Please confirm that the prohibited purposes listed in Section 2.2, as clarified by USDA's response to this letter, will apply to all federal agencies.

4. Relatedly, the protocol reserves the right to "refer fraud detection leads to USDA OIG and other law enforcement agencies where a criminal nexus has been drawn specifically to SNAP." How does the USDA define a "criminal nexus"? Could the USDA provide examples of (a) what would constitute such a "criminal nexus" and (b) which agencies could potentially receive such a referral?

5. We also believe any protocol must also address how USDA would handle external requests (FOIA, administrative subpoena or otherwise) to obtain States' SNAP data. Will USDA provide clarification of these issues and agree to protocol language alerting any State to such a request and providing sufficient time for the State to respond prior to any USDA disclosure of data?

6. Currently, the proposed protocol only limits "access" to the database (*see* § 4), but does not similarly restrict USDA's ability to *disclose* the data.

(a) Pursuant to 7 U.S.C. § 2020(e)(8), will USDA include a clause that prohibits the agency from disclosing the requested data except to persons "directly connected with the administration" of the SNAP Act, for the purpose of administering or enforcing the SNAP Act only?

(b) Will USDA include a clause requiring the agency to identify the specific entities and individuals to whom the USDA intends to disclose data, and how they are "directly connected with the administration" of the SNAP Act, pursuant to 7 U.S.C. § 2020(e)(8)?

7. Relatedly, the proposed protocol contains contradictory statements that require clarification. It claims to limit "access" to data by anyone outside of the USDA, but then purports to require data matching that will entail sharing data outside of USDA.

(a) Can USDA provide clarification to reconcile these statements?

(b) Will USDA include a limitation in the proposed protocol to prevent data from being copied and/or sent outside of USDA's database?

(c) Prior data sharing agreements with USDA have specifically identified individuals who would be able to access States' data, and required those individuals to attest to compliance with the protocols. Will USDA agree to similar requirements here, and commit not to provide access to any individual without advance notice to States and providing sufficient time for States to respond prior to USDA providing that access?

13

Ex. 8-014

(d) What measures will USDA take to prevent any redisclosure or improper intermingling of the data?

*Understanding the protocol's interaction with the SORN and Privacy Impact Assessment*

8. The proposed data protocol relies on USDA's existing SORN, but USDA has represented that it will publish an "updated SORN." *See* ECF No 90-1 at 2. Please let us know when that SORN will be published, and how it will address changes between the data request elements attached to the November 24, 2025 letter and USDA's prior data requests.

9. The proposed data protocol and the SORN are also at odds with each other on important issues. For example, the SORN states that records "will be kept indefinitely," which directly contradicts the protocol's proposal that data "shall be retained for no longer than three years." The protocol also restricts access to "[a]ny other federal agency" (§ 4.2.4), yet the SORN's routine uses permit disclosure to the Department of Justice and Department of the Treasury. Please clarify how USDA will reconcile these discrepancies, and whether USDA will commit to enforcing all restrictions on data access agreed upon in a final protocol, and not permitting the SORN's broader "routine use" language to control.

10. USDA's Privacy Impact Assessment associated with this data collection indicates that USDA expects this to be an ongoing data collection effort with "quarterly updates."

(a) Is that the case, and if so, what is the source of USDA's authority to require States to provide virtually all SNAP data to USDA on a quarterly basis?

(b) Does USDA intend to compensate States for the additional administrative burden that such an ongoing collection would present?

11. USDA's Privacy Impact Assessment associated with this data collection acknowledges the need to "[o]btain explicit consent for the collection and processing of sensitive personal information[.]" The proposed protocol does not mention obtaining consent from SNAP participants.

(a) How does USDA intend to obtain this consent from SNAP participants? Will USDA provide a draft notice to States?

(b) Does USDA expect States to assume the burden of obtaining this consent and, if so, does USDA intend to compensate States for the additional administrative burden that this would present?

*Clarifying USDA's proposed security measures*

12. Section 9, "Data Security and Technical Requirements," is comprised only of bulleted concepts, with no complete sentences and very limited detail. Will USDA revise this section to provide full sentences and a more thorough description of the security protections the agency intends to use, so that we may properly evaluate their sufficiency?

14

Ex. 8-015

*Clarifying the methodologies and processes that USDA intends to implement*

13. States necessarily rely on numerous outside data sources to verify SNAP eligibility; this process is often time and labor intensive, particularly given our commitments to ensure that only eligible households receive benefits.

    (a) Given that outside, third-party data sources are essential to verification, how does USDA plan to review and verify eligibility of SNAP files without review of these data sources?

    (b) If USDA is requiring production of those third-party data sources (which is unclear), can USDA provide authority for that demand and authority authorizing States to disclose this third-party data?

    (c) In addition, please clarify how the "permitted" submission of verification records (per § 3.2) is consistent with the statement in § 3.1.2 that such verification records are "excluded" from this project.

14. Section 6.1.1 states that USDA "will employ a foundational fraud, waste, and abuse verification similar to the SNAP Quality Control program." Please explain what a "foundational . . . verification" is, and how this data project differs from existing verification tests set forth in statute and promulgated regulations.

15. Section 6.2 lists several "enhanced" or "additional" data techniques. Please provide the methodologies for these techniques and explain why USDA believe they will produce valid statistical results. In particular:

    (a) Please explain how USDA's proposed detection of duplicate benefits will differ from the existing protections offered by the NAC and other established verification tests, and how USDA will resolve any conflicts between the NAC process and the one USDA proposes here.

    (b) Please explain how USDA's proposed detection of deceased individuals will differ from existing State systems for removing deceased beneficiaries from SNAP benefit rolls, and how this analysis will comport with USDA's requirements for such actions (including to ensure that households have an opportunity to address any inaccurate data before a reduction in benefits).

    (c) Please explain what USDA means by "synthetic identity patterns" and how this proposal will seek to detect such patterns.

    (d) Please explain what USDA means by "geographic anomalies" and how this proposal will seek to detect such anomalies.

    (e) To the extent EBT fraud is a concern, FNS already receives daily transaction data for all EBT transactions under the Anti-Fraud Locator using EBT Retailer Transactions (ALERT) system. ALERT monitors that transaction activity and identifies suspicious

Ex. 8-016

retailers for analysis and investigation. Given the existence of this system and FNS's preexisting access to all EBT transaction data, what purpose does such duplicative analysis serve in the SNAP Information Database?

(f) Will USDA be using artificial intelligence programs to analyze the data? If so, can USDA provide more information about those programs, including the security and privacy protections employed by the program?

16. USDA states in Section 7.1 of the proposed protocol that it will "provide flagged data back to the State agency for review," and will work collaboratively "to ensure accurate identification of fraud and appropriate corrective actions." Please clarify specifically what USDA intends this process to entail. Furthermore, please provide details on what this collaborative process has entailed to date for States that have already provided SNAP data.

Ex. 8-017